Jared Allebest, #13485 (UT) #034640 (AZ) #325086 (CA)
Allebest Law Group PLLC
Attorney for Plaintiffs
212 East Crossroads Blvd #207
Saratoga Springs, Utah 84045
Cell: (801) 900-3858
Videophone: (801) 204-9055
Email: Jared@Allebest.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ARTURO RUVALCABA, an individual, and Roes I-X<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY (DHS); KRISTI NOEM, in her official capacity as Secretary of the DHS; IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE); TODD LYONS, in his official capacity as Acting Director of ICE; ROBERT CORDERO in his official capacity as the Assistant Field Office Director for the ICE Salt Lake City Field Office; U.S. DEPARTMENT OF JUSTICE (DOJ); PAMELA BONDI, in her official capacity as Attorney General; TWO UNKNOWN FEDERAL IMMIGRATION ENFORCEMENT OFFICERS, and ROES I-X.<br><br>Defendants. | COMPLAINT<br><br>Civil No. 2:25-cv-1079<br><br>Judge<br><br>Jury Trial Requested |

ARTURO RUVALCABA (hereinafter "Mr. Ruvalcaba"), by and through his attorney JARED M. ALLEBEST of the Allebest Law Group PLLC, hereby submit the following:

1

## PRELIMINARY STATEMENT

1. Mr. Ruvalcaba, the Plaintiff, is an individual who is Deaf, and is bilingual in English and American Sign Language (ASL). He does not use hearing aids, cochlear implants, or other similar personal amplification devices. He is a lawful permanent resident[1] of the United States since he has a current and valid Green Card.

2. This action stems from ICE confronting Mr. Ruvalcaba who indicated that he was Deaf. He asked for an ASL interpreter, and they declined that request. They became physically aggressive with him, which caused injuries that required medical attention and to take unpaid leave from work to recover from his injuries. ICE released him after they searched him and found his Green Card.

3. President Trump, as the chief executive, not only has the duty to enforce laws, but also the authority to decide how to do so via the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 et seq.) and section 301 of title 3, United States Code.

4. However, the various departments and agencies such as the U.S. Department Of Homeland Security (DHS), Immigration And Customs Enforcement (ICE), and The U.S. Department Of Justice (DOJ) and its employees, staff, agents, officers and independent contractors must enforce the laws within the boundaries of the United States Constitution and federal laws such as the Immigration and Nationality Act (INA) (8 U.S.C. 1101 et seq.) and the Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794). It is worth noting that Title II of the Americans with Disabilities Act does not apply to the federal government and its agencies such as U.S. Department Of

---

[1] A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" 8 U.S.C. § 1101(a)(20).

Homeland Security (DHS), Immigration And Customs Enforcement (ICE), and The U.S. Department Of Justice (DOJ)[2].

5. The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. These Fourth Amendment principles are bolstered by federal laws and regulations that restrict immigration officers' powers.

6. For example, immigration enforcement agents do not have unfettered authority to make warrantless arrests. Section 8 U.S.C. § 1357(a)(2) requires that an agent have probable cause to believe that the person being arrested is (1) in the United States in violation of immigration laws and (2) likely to escape before a warrant can be obtained. This means an arresting immigration officer must make two probable cause determinations pre-arrest; otherwise, the arrest is unlawful.

7. In the Immigration and Nationality Act ("INA"), Congress placed restrictions on the ability of immigration agents to conduct warrantless arrests. Section 287(a)(2) of the INA, codified as 8 U.S.C. § 1357(a)(2), imposes two conditions that must be met before an agent makes a warrantless arrest: the agent must have "reason to believe" both that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." Id. 28 (Federal regulations track the prohibition on conducting a warrantless immigration arrest without establishing likelihood of escape. See 8 C.F.R. §

---

[2] See 42 U.S.C. § 12131(1) ("The term 'public entity' means . . . any State or local government" or "any department, agency, special purpose district, or other instrumentality" thereof). "[t]he plain language of Title II the ADA excludes the federal government from the reach of the statute." *McColm v. Cal*., 2017 U.S. Dist. LEXIS 17266, 2017 WL 511855, at *1 (E.D. Cal. Feb. 7, 2017). See also *Drevaleva v. Dep't of Veterans Affs*., 835 F. App'x 221, 223 (9th Cir. 2020) ("The district court properly dismissed Drevaleva's claim because the federal government is excluded from the coverage of the ADA."); *Valli v. Mayorkas*, 707 F. Supp. 3d 980, 2023 U.S. Dist. LEXIS 223894, 2023 WL 8704726, at *8 (S.D. Cal. Dec. 15, 2023); *Rica Ty v. Mayorkas*, No. SA CV 24-760-JFW(DFMx), 2024 U.S. Dist. LEXIS 163012 (C.D. Cal. Sep. 9, 2024), ("Title II of the ADA does not apply to the federal government") and Cellular Phone Taskforce v. FCC, 217 F.3d 72 (2d Cir. 2000) ("Title II of the ADA is not applicable to the federal government").

287.8(c)(2)(ii). The federal regulations further require immigration officers to identify themselves and state the reason for the arrest. Id.

8. The basis for passing the Americans with Disabilities Act was because Congress found that physical or mental disabilities do not "diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination" and that historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(1-2)

9. As a result, "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services" and "that unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination" 42 U.S.C. § 12101(a)(3-4)

10. Thus, "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services,

programs, activities, benefits, jobs, or other opportunities" and that "census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C. § 12101(a)(5-6)

11. Based on the above facts, Congress saw that the "Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals" and "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 U.S.C. § 12101(a)(5-6).

12. As a result, "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R § 35.130(a).

13. Furthermore, a public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability" deny "a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service "afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to

gain the same benefit, or to reach the same level of achievement as that provided to others; provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards" or "otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R § 35.130(b)(1)(i-vii).

14. Additionally, a "public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities." 28 C.F.R § 35.130(b)(2).

15. Finally, a "public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities" or "that perpetuate the discrimination of another public entity

if both public entities are subject to common administrative control or are agencies of the same State."

16. When Mr. Ruvalcaba indicated to ICE through sign language and gestures that he was Deaf and wanted an American Sign Language interpreter, he was trying to communicate with them in the only way he could due to his disability since he cannot hear or speak because he is Deaf.

17. Deaf people are often regarded as individuals with limited English proficiency (LEP) because English is not their primary language. American Sign Language is their primary language. As a result, it is not surprising that many of them cannot read or write since there are reports that indicate that about "thirty percent of the deaf population is functionally illiterate, reading at a grade level 2.8 or below and approximately 60% of deaf persons are unable to read and understand the Miranda warnings, which are typically written at about the eighth-grade level."

18. Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." (29 U.S. Code § 794(d). This law is enforceable through Title VI of the Civil Rights Act of 1964, which provides (inter alia) for the termination of federal financial assistance to recipients who

discriminate in violation of section 504.[3]

19.  Federal agencies and their components must provide reasonable accommodations to ensure persons with disabilities have meaningful access to the agency's programs and activities.[4] Defendants knowingly and intentionally denied Mr. Ruvalcaba his right to reasonable accommodations by failing to provide him with an appropriate interpreter and/or written communication that were necessary to ensure he has meaningful access to effective communication when ICE attempted to seize and detain the Plaintiff.

20.  Section 504 imposes an affirmative obligation on those agencies to make their benefits, programs and services accessible to such persons.[5] This includes the obligation to assess and identify individuals with disabilities and take steps to ensure that they have meaningful access to all aspects of the detention and removal system.[6] Upon notice of the need for an accommodation, a public entity must investigate what constitutes a reasonable accommodation of the disabled person's need for interpretation.[7]

21.  Regulations implementing Section 504 expressly require that Defendant DHS "furnish appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the Department…. [and] give primary consideration to the requests of the individual with a disability." 6 C.F.R. § 15.60.

---

[3] See _Rivera v. Heyman_, 157 F.3d 101 (2d Cir. 1998) and _DiPompo v. West Point Military Academy_, 708 F. Supp. 540 (S.D.N.Y. 1989)

[4] _Alexander v. Choate_, 469 U.S. 287, 300-01 (1985).

[5] _Updike v. Multnomah County_, 870 F.3d 939, 949 (9th Cir. 2017).

[6] See _Hunsaker v. Contra Costa Cnty._, 149 F.3d 1041, 1043 (9th Cir. 1998), citing _Alexander_ at 299; _Armstrong v. Brown_, 732 F.3d 955, 958-62 (9th Cir. 2013).

[7] _Updike_ at 958

22. It is worth noting that Utah has a law requiring that qualified ASL interpreters must also be licensed and certified. Utah recently passed HB371 which amended Title 53A, Chapter 26a to now require interpreters to obtain state certification as American Sign Language-trained interpreters and that anyone who interprets in the state of Utah without being certified is charged with a Class B Misdemeanor.

23. As a result of the passage of HB371, Utah Administrative Code Rule R746-510-2, defines a "Certified Interpreter" to mean a "person who is certified as meeting the certification requirements" of the "Interpreter Services for the Hearing Impaired Act."

24. Defendants have established procedures to address compliance with these obligations and issued policies, directives, guidance and plans consistent with the mandates of Section 504.[8] These documents generally create and provide procedures to ensure the proper implementation of Section 504. For example, the USCIS Policy Manual states that in interviews with its officers, an individual may request an accommodation, such as an appropriate sign language interpreter, to ensure equal access to the component's benefits, services, and activities.[9]

25. "The standards used to determine whether this section has been violated in a

---

[8] See, e.g., DHS Directive 065-01 Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment) (Sept. 25, 2013); DHS Instruction 065-01-001 Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted programs and Activities (Non-Employment) (Mar. 7, 2015); USCIS Access and Accommodations for Individuals with Disabilities: Plan for Access to USCIS Public-Facing Programs and Activities (Oct. 2018) (instructing USCIS programs to "update policies to reflect that sign language interpretation requests are not limited to American Sign Language"). See also A Guide to Interacting with People Who Have Disabilities: A Resources Guide for DHS Personnel, Contractors, and Grantees from the Office of Civil Rights and Civil Liberties, available at www.dhs.gov/sites/default/files/2023-10/23_1026_crcl_guide_to_interacting_with_people_who_have_disabilities_508.pdf.

[9] USCIS Policy Manual, Chapter 6, Sections A-B. Similarly, ICE Directive 11071.1 Assessment and Accommodations for Detainees with Disabilities (December 15, 2016) (states that detained noncitizens with disabilities "may request and receive appropriate auxiliary aids and services, reasonable accommodations, and modifications to policies, practices, and procedures" and that these accommodations may include things that allow for "effective communication" such as interpreters or video remote interpreting services.

complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510,[1] of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment." (29 U.S. Code § 794(d).

26. The Plaintiff was discriminated by reason of his disability of being Deaf as ICE unlawfully searched and seized Mr. Ruvalcaba, despite the fact that he had clearly indicated that he was Deaf and could not hear their commands and could not communicate with them in spoken English which resulted in his injuries that caused him to take unpaid leave from work to recover from his injuries.

## JURISDICTION AND VENUE

27.    This action arises under the law of the United States, including Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the Administrative Procedure Act, 5 U.S.C. § 551 et seq.

28. The Court has jurisdiction over this action under 5 U.S.C. § 702, 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. 1343(a)(3), as well as 42 U.S.C. § 12188(a) and 29 U.S.C. § 794a and 42 U.S.C. § 1983 for claims arising under color of law.

29. Venue of this action is appropriate in the United States District Court for the District of Utah, Central Division, pursuant to 28 U.S.C. § 1391(b) and (c) as the claim arose in such district and, further, as the Defendant(s) conduct business in such district.

30. This Court also has jurisdiction over Mr. Ruvalcaba's state law claims set forth in this complaint pursuant to its supplemental jurisdiction to hear state law claims under 28 U.S.C. § 1367(a). Both the federal and state claims alleged herein arose

under a common nucleus of operative facts, the state action is so related to the federal claim that they form part of the same case or controversy, and the actions would ordinarily be expected to be tried in one judicial proceeding.

## THE PARTIES

31.     Arturo Ruvalcaba, the Plaintiff, is an individual who is Deaf and communicates via American Sign Language. He does not use hearing aids, cochlear implants, or other similar personal amplification devices. Plaintiff is, and at all times relevant herein was, a qualified individual with a "disability" as defined under Section 504 and its implementing regulations (29 U.S.C. § 705(20)(A)-(B); 28 C.F.R. 41.32(b)). As a result, he is substantially limited in the major life activity of hearing, speaking, communicating, and interacting with others. (28 C.F.R. § 35.160(c)(1)(i)). The Plaintiff is from Mexico but currently holds a Green Card and is a lawful permanent resident[10] of the United States.

32. Defendant Kristi Noem is the Secretary of DHS. Defendant Noem is sued in her official capacity. In that capacity, Defendant Noem is responsible for overseeing enforcement and the implementation of provisions of the INA related to the arrest, detention, and processing of asylum applications of individuals seeking admission to the United States, and compliance with the applicable provisions of the Rehabilitation Act. Defendant Noem is sued in her official capacity.

33. Defendant DHS is a Department of the Executive Branch of the United States government, headquartered in Washington, D.C., and is responsible for enforcing federal laws governing customs, border control, and immigration. DHS is an executive

---

[10] A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" 8 U.S.C. § 1101(a)(20).

agency within the meaning of Section 504 and also receives federal financial assistance within the meaning of Section 504.

34. The United States Immigration And Customs Enforcement ("ICE") is, and at all times relevant herein was, a federal governmental entity under the jurisdiction and control of the United States of America. ICE is a federal law enforcement agency under the United States Department of Homeland Security. ICE is an executive agency within the meaning of Section 504 and also receives federal financial assistance within the meaning of Section 504. Defendant ICE is the DHS component responsible for carrying out removal orders and overseeing immigration detention.

35. Defendant Todd Lyons is sued in his official capacity as the Acting Director of ICE, an agency of the United States and a division of DHS. Acting Director Lyons is responsible for ICE's enforcement and removal operations, including ICE's administration of holding and detention facilities, and is responsible for ensuring ICE agents' compliance with the Constitution and other applicable laws and policies at ICE facilities.

36. Robert Cordero is the Assistant Field Office Director for the ICE Salt Lake City Field Office (West Valley City). Michael Bernacke was previously the Salt Lake City ICE Field Office Director, but he stepped down sometime in June of 2025 after calls for his removal from Governor Cox and local law enforcement groups.[11] Since Mr. Bernacke's departure, ICE has not posted a named successor for the Salt Lake City ICE Field Office Director. Furthermore, the Trump administration is allegedly

---

[11] Tomco, Brigham. Deseret News. "Exclusive: Gov. Cox calls on Trump administration to remove ICE obstacles to deportations." January 3, 2025. https://www.deseret.com/politics/2025/01/03/utah-gov-cox-trump-administration-remove-ice-obstacles-to-deportations/?utm_source=chatgpt.com. Accessed on October 15, 2025.

reassigning at least half the top leadership at Immigration and Customs Enforcement offices around the country in a major shake-up of the agency responsible for carrying out the president's vision for mass deportations.[12]

37. Defendant United States Department of Justice ("DOJ") is a cabinet-level Department of the federal government. DOJ is charged with implementing and enforcing certain provisions of the INA, including those related to the review of credible threat determinations made asylum officers as provided in 8 U.S.C. § 1225(b)(1)(B)(iii). DOJ is an executive agency within the meaning of Section 504 and also receives federal financial assistance within the meaning of Section 504.

38. Defendant Pamela Bondi is the Attorney General of the United States, the principal officer in charge of DOJ. She is sued in her official capacity. In that capacity, Defendant Bondi, along with Defendant Noem, is responsible for the implementation and enforcement of immigration laws and applicable provisions of the Rehabilitation Act.

39. Plaintiff is informed and believes that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venturer, parent, subsidiary, affiliate, related entity, partner, and/or associate, or such similar capacity, of each of the other Defendants, and was at all times acting and performing, or failing to act or perform, within the course and scope of such similar aforementioned capacities, and with the authorization, consent, permission or ratification of each of the other Defendants, and is personally responsible in some manner for the acts and omissions

---

[12] Santana, Rebecca and Spagat, Elliot. Associated Press. "Trump administration shakes up ICE leadership across the country in major overhaul, AP sources say." October 28, 2025. https://apnews.com/article/immigration-border-patrol-ice-trump-deportation-69b599f8e7e7826f72b90068385a0047. Accessed on November 2, 2025

of the other Defendants in proximately causing the violations and damages complained of herein, and have participated, directed, and have ostensibly and/or directly approved or ratified each of the acts or omissions of each of the other Defendants, as herein described.

## FACTS

40. President Trump issued several executive orders regarding enforcement of immigration laws, securing the American border, and dealing with foreign terror organizations on January 20, 2025. President Trump issued executive orders such as "Securing our Borders", "Protecting the Meaning and Value of American Citizenship", "Realigning the United States Refugee Admission Program", "Declaring a National Emergency at the Southern Border of the United States", "Clarifying the Military's Role in Protecting the Territorial Integrity of the United States", "Protecting the American People Against Invasion," "Protecting The United States From Foreign Terrorists And Other National Security And Public Safety Threats", "Guaranteeing the States Protection Against Invasion", and "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists."[13]

41. As a result of these executive orders, ICE, CBP, and other federal agencies are confronting, seizing, and arresting U.S. citizens, lawful permanent residents, refugees and asylum seekers, and individuals with valid visas or other legal authorization.[14]

---

[13] NPR Staff. National Public Radio. "All the executive orders Trump has signed after 1 week in office." January 28, 2025. https://www.npr.org/2025/01/28/nx-s1-5276293/trump-executive-orders. Accessed on November 2nd, 2025.

[14] Jamie Nesbitt Golden & Francia Garcia Hernandez, Family and Friends Rally to Free Man Taken by Ice on Chicago Skyway, Block Club Chicago (Oct. 1, 2025), https://blockclubchicago.org/2025/10/01/family and friends-rally-to-free-man-taken-by-ice-on-chicago-skyway/ [https://perma.cc/ALJ7-7FWE]; Nicholas Bogel-Burroughs et al., A

42. Following President Trump's second inauguration in January 2025, the Administration set out to increase immigration enforcement, even if doing so required "push[ing] the envelope" of its authority.[15]

43. In late May, the White House and the Department of Homeland Security (DHS) recast their goals as a quota: immigration enforcement agents must make 3,000 immigration-related arrests per day or face "consequences for not hitting arrest targets."[16]

44. To reach that number, top White House aide Stephen Miller directed immigration enforcement agents to change their approach to arrests in the field. These agents, according to the White House, should no longer conduct targeted and investigation-based operations. Instead, they should "just go out there and arrest" in public spaces.[17]

45. The Administration also encouraged immigration agents to "turn the creative knob up to 11" when it comes to enforcement, including through arrests collateral to anyone actually identified in a warrant.[18]

46. It has been reported that federal agents who are tasked with enforcing US

---

Squalid Building, a Tip to the Feds, and Then 'Straight-Up Chaos', New York Times (Oct. 19, 2025), https://www.nytimes.com/2025/10/19/us/chicago-south-shores-border-patrolraid.html [https://perma.cc/FYY8-9S8Z]; Nicole Foy, We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days, Pro Publica (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detainedagainst-will [https://perma.cc/HKM3-9DZQ].

[15] Jose Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian (June 4, 2025), https://perma.cc/4SSK-EQUC.

[16] David J. Bier, 65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions, Cato Institute (June 20, 2025), https://perma.cc/SP8K-J8CR; Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/H9RU-BJNX.

[17] Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/H9RUBJNX.

[18] Jose Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian (June 4, 2025), https://perma.cc/4SSK-EQUC.

immigration laws have been told to arrest individuals "based on how they look" as confirmed by Gregory Bovino, Commander-at-Large of CBP[19] which has increased the number of people arrested.

47. On Monday, September 29, 2025, at approximately 4:20 p.m., Mr. Ruvalcaba was waiting at the SLCC bus stop on his way home from work when several individuals, later identified as ICE agents, arrived, and approached Mr. Ruvalcaba.

48. Three white Ford SUVs pulled up to the bus stop. Mr. Ruvalcaba was unable to determine the total number of agents present; however, two agents directly approached him. Both were dressed in green military-style uniforms with bulletproof vests and baseball caps, and their faces were partially covered. The agent positioned in front of him did not display any visible identification on their uniform, while the agent standing behind him had "ICE" labeled on their vest.

49. The agents began shouting commands, but since Mr. Ruvalcaba is Deaf, he was unable to understand what they were saying. He attempted to communicate his Deafness through gestures and by signing, but the agents continued to advance toward him. While Mr. Ruvalcaba was attempting to retrieve documentation to prove his lawful status in the United States, the agent who stood behind Mr. Ruvalcaba and applied downward pressure on his shoulders while another agent positioned in front of him pulled forcefully on his arm. This action resulted in an injury to his elbow.

50. During this encounter, he observed four other individuals at the bus stop

---

[19] Chip Mitchell, Transcript: Gregory Bovino Says Arrestees in Downtown Chicago Chosen Partly on 'How They Look', WBEZ Chicago (Sept. 30, 2025), https://www.wbez.org/immigration/2025/09/30/transcriptaudio-gregory-bovino-immigrant-arrests-downtown-chicago-chosen-how-they-look [https://perma.cc/YA6Q-GCWJ]; Chip Mitchell et al., Feds March Into Downtown Chicago; Top Border Agent Says People are Arrested Based Partly on 'How They Look', Chicago Sun Times (Sept. 28, 2025), https://chicago.suntimes.com/immigration/2025/09/28/ice-agents-spotted-downtown-on-michiganavenue-along-chicago-river [https://perma.cc/UXK4-KK4Y].

being handcuffed and taken into custody. Mr. Ruvalcaba continued trying to show his identification documents. Once he was finally able to retrieve and present them to the ICE Officers, the agents released him and promptly departed the area.

51. After returning home, Mr. Ruvalcaba experienced pain and swelling in his arm. When his wife arrived home, she observed the swelling and immediately contacted their doctor to determine whether he should go to the emergency room or wait until the following morning. After describing his condition, the doctor advised that he could wait to be seen the next day, as he was able to move his arm with pain and tolerate the application of ice.

52. On September 30, 2025, at 10:30 a.m., Mr. Ruvalcaba was examined by his primary care physician. She evaluated his range of motion and diagnosed him with a sprained elbow. She provided a medical note excusing him from work for the remainder of the week and recommended beginning physical therapy.

53. On October 6, 2025, Mr. Ruvalcaba attempted to return to work but experienced significant pain and was unable to perform his duties. He contacted his wife around 9:00 a.m., and she picked him up from work. That afternoon, Mr. Ruvalcaba was re-evaluated by his physician, who noted that the swelling persisted. She again recommended physical therapy and issued an additional medical note excusing him from work for two weeks, from October 6 through October 17, 2025.

54. Following that appointment, Mr. Ruvalcaba's wife scheduled his first physical therapy session for October 9, 2025. During that session, the physical therapist provided exercises and stretches to support recovery and advised that he wear either a compression sleeve or a wrist brace for additional support. The therapist also instructed

him to avoid repetitive movements and heavy lifting.

55. Mr. Ruvalcaba notified his employer that he intended to return to work on October 14, 2025, with medical restrictions. His employer requested a formal letter outlining these restrictions. His physician subsequently provided documentation stating that he was not to lift more than five pounds and should avoid repetitive movements involving his left arm.

56. Mr. Ruvalcaba is currently back at work, and he is wearing a wrist brace as advised, and is continuing with prescribed physical therapy. His most recent therapy appointment occurred as scheduled on October 24, 2025.

57. Mr. Ruvalcaba was never charged with a crime because he had not done anything wrong.

58. The officers who seized, assaulted, and detained Mr. Ruvalcaba never had any valid reason to believe the Plaintiff had done anything wrong; they had no individualized suspicion before arresting him and did not ask Mr. Ruvalcaba any questions to test their generalized profile.

59. The ICE seized, assaulted, and detained arrested the Plaintiff because he looks Latino.

## I. ICE's Policy and Practice of Effecting Warrantless Arrests Without Making Individualized Determinations of Legal Status and Flight Risk Violates Federal Law and ICE's Own Policies

60. In the Immigration and Nationality Act ("INA"), Congress placed restrictions on the ability of immigration agents to conduct warrantless arrests. Section 287(a)(2) of the INA, codified as 8 U.S.C. § 1357(a)(2), imposes two conditions that must be met

before an agent makes a warrantless arrest: the agent must have "reason to believe" both that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." Id. 28 (Federal regulations track the prohibition on conducting a warrantless immigration arrest without establishing likelihood of escape. See 8 C.F.R. § 287.8(c)(2)(ii). The federal regulations further require immigration officers to identify themselves and state the reason for the arrest. Id. (c)(2)(iii).

61. "Reason to believe" is "considered the equivalent of probable cause," _Lau v. U.S. Immigr. & Naturalization Serv._, 445 F.2d 217, 222 (D.C. Cir. 1971), which "must be particularized with respect to the person to be searched or seized," Barham v. Ramsey, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting Maryland v. Pringle, 540 U.S. 366 (2003)).

62. Immigration officers have long understood that they do not have unfettered authority to make warrantless arrests in the interior of the United States. The requirement to determine legal status and flight risk before arresting an individual without a warrant predates the original 1952 INA and was enacted to constrain warrantless arrests after immigration officers in the 1940s were regularly effecting arrests without warrants in excess of their statutory authority.

63.  ICE agents may not make categorical assumptions about likelihood of escape based on a person's apparent race and assumed immigration status. If probable cause to believe somebody did not have lawful presence in the country were sufficient, there would be no reason to separately require probable cause that the individual also posed a flight risk. Instead, § 1357 requires agents to make an individualized determination of both status and flight risk before they can lawfully conduct a

warrantless arrest.

64. In other words, ICE does not have authority to arrest Utahns without a warrant unless they have probable cause to believe that the person is in this country in violation of immigration law and is a flight risk.

65. ICE previously understood this and said as much in its own policies, even though they have been ignoring the requirements on a widespread basis since at least January 2025.

66. In 2022, DHS adopted explicit requirements for agents in the field when they conduct any warrantless arrest under 8 U.S.C. § 1357(a)(2).

67. In 2022, as part of a lawsuit settlement that applied to the Chicago ICE office area of responsibility, DHS issued a "Broadcast Statement of Policy" outlining requirements for evaluation and documentation of flight risk that constitute "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)."[20]

68. Under this "Broadcast Statement of Policy," immigration officers were required to consider the totality of the circumstances in evaluating an individual's "likelihood of escape," including an individual's community ties (such as their family, home, or employment) and an individual's prior attempts to escape or evade immigration authorities.[21]

69. The policy further required that immigration officers who have made a warrantless arrest document the facts and circumstances surrounding the warrantless

---

[20] *Castañon Nava v. DHS*, No. 1:18-cv-03757, Dkt. 15-1 (Broadcast Statement of Policy), at ¶ 27. https://perma.cc/J8HP-VGL2.
[21] Id. at ¶ 1

arrest "as soon as practicable."[22]

70. The documentation was required to include, among other things, "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained."[23]

71. In May 2025, DHS and ICE claimed that the settlement had expired and then immediately rescinded the Broadcast Statement of Policy and encouraged its agents to engage in warrantless arrests.[24]

72. And even before DHS rescinded its guidance, ICE was violating the requirements of § 1357(a)(2) and facing motions to enforce in the Castaño-Nava case. That Court recently found that, under the current Administration, ICE committed repeated, material violations of the settlement by engaging in warrantless arrests in violation of the requirements of § 1357(a)(2). The Court extended the settlement agreement to February 2, 2026, and ordered ICE to reissue the Broadcast Statement of Policy to all ICE officers.[25]

## II. ICE Will Continue Its Unlawful Practices Without Court Intervention

73. Despite federal law, ICE agents have continued to conduct illegal arrests in Utah —including during broad immigration sweeps, individual stops, and collateral detentions—and are hailing the success of their escalated enforcement operations.

## III. ICE's unlawful tactics will not stop absent court intervention.

74. Tom Homan, a former ICE director who now serves as President Trump's

---

[22] Id. at 2.

[23] Id.

[24] Marisa Kabas, The Handbasket, ICE agents get green light to make unjustified warrantless arrests (June 12, 2025), https://perma.cc/E794-KCHH.)

[25] *Castañon Nava v. DHS*, No. 1:18-cv-03757, Memorandum Opinion and Order, Dkt. 214 (N.D. Ill., Oct. 7, 2025), Ex. O to Motion for Preliminary Injunction.

"Border Czar," has repeatedly confirmed the Administration's intent to rely on indiscriminate warrantless arrests throughout the United States, including in jurisdictions like Utah that they label as a "sanctuary" states.

75. Mr. Homan has "said from Day 1," that arresting any person in the U. S. without lawful presence is "not off the table" because the Administration and DHS are "opening th[e] aperture [of immigration enforcement policy] up."[26]

76. Mr. Homan has publicly stated that DHS has a new "mandate" to make collateral arrests to increase their arrest numbers. He explained that "unlike the last administration," President Trump's DHS is not "going to tell ICE officers not to arrest an illegal alien" if that noncitizen is found with others targeted by the agency.[27]

77. The head of ICE, Defendant Todd Lyons, agreed publicly that non-criminals in the United States will be taken into custody collaterally during arrest operations.[28]

**VI. ICE is also hiring new recruits for increases in enforcement operations.**

78. President Trump's budget in the "One Big Beautiful Bill," signed into law in July 2025, designated $170 billion to immigration enforcement, including more than $45 billion for additional ICE detention space. President Trump's budget also allocated $8 billion to ICE to hire 10,000 new officers through 2029.[29]

79. Mr. Ruvalcaba's experience with ICE is not unique as a Deaf individual living within the United States. For example, Bayartulga Avirmed is Deaf individual from

---

[26] Hamed Aleaziz, Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests, The New York Times (June 13, 2025), https://perma.cc/E3RE-RK7S.
[27] Adam Shaw, Trump border czar Tom Homan reveals ICE teams are already arresting 'public safety threats', Fox News (Jan. 21, 2025), https://perma.cc/VW65-PPZ9.
[28] (Camilo Montoya-Galvez, ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers, CBS News (July 21, 2025), https://perma.cc/RT3S-CJP4.
[29] Fed Agent, DHS Readies for Funding Surge After "Big Beautiful Bill" Passage, (July 10, 2025), https://perma.cc/ALT6-AKYR.

Mongolia who was arrested by U.S. Customs and Border Protection (CBP). CBP did not provide Mr. Avirmed with a sign language interpreter at any point during his arrest, processing, or detention by CBP officials. CBP transferred Mr. Avirmed to Immigration & Customs Enforcement-Enforcement & Removal Operations ("ICE-ERO") for confinement an ICE facility in San Diego, California where he was questioned by ICE without a sign language interpreter.[30]

80. It is becoming increasingly clear that immigration officers across the country and throughout Utah are making warrantless arrests without the requisite probable cause determinations regarding legal status and flight risk.

81. For the Plaintiff, immigration agents never assessed his flight risk, nor did they obtain a warrant before making an attempt to arrest Mr. Ruvalcaba.

82. Absent judicial intervention, Defendants will continue their unlawful practices in Utah, and the Plaintiff is likely to suffer repeat encounters with ICE attempting to make unlawful arrests.

83. Because of ICE's actions, the Plaintiff lives in fear that ICE could attempt to seize and detain him again regardless of whether they are a flight risk. ICE's actions have also stoked intense anxiety and fear of future harm with the Plaintiff and his family.

## **FIRST CAUSE OF ACTION**

### Violations of the Fourth Amendment – Injunctive Claim

84. Plaintiffs repeat and re-allege each and every allegation contained in

---

[30] Fry, Wendy. Cal Matters. "Deaf Mongolian immigrant held by ICE in California for 4 months with no access to interpreter." July 11, 2025. https://calmatters.org/justice/2025/07/ice-detention-deaf-asylum-seeker/. Accessed on November 4, 2025. See also Fry, Wendy. Los Angeles Times. "ICE releases deaf Mongolian immigrant after holding him for months without interpreter." July 26, 2025. https://www.latimes.com/california/story/2025-07-26/la-me-ice-release-calmatters. Accessed on November 4, 2025. See also *Avirmed v. DHS*, et al., Case No. 3:25-cv-01310-DMS-DE. ¶¶ 42-67.

paragraphs 1 through 83 hereof, and incorporate the same herein by reference.

85. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

86. Moreover, the Fourth Amendment codifies the constitutional preference for warrants based on probable cause before government agents can enter private property, conduct a search, or seize a person or their property.

87. The Fourth Amendment prohibits officers from stopping people at random to determine their immigration status.

88. To restrict an employee's movement to investigate their immigration status, officers must have specific articulable facts that, considered with the totality of the circumstances, reasonably warrant suspicion that a specific employee is in the country illegally.

89. Someone's race or ethnicity does not create reasonable suspicion of someone's immigration status.

90. An individual must do something to create reasonable suspicion.

91. Reasonable suspicion, in turn, allows only a limited detainment to gather information.

92. During that detainment, the officer may ask questions to confirm their suspicions, but the worker does not have to respond.

93. Only if the investigatory detainment reveals specific information to generate probable cause can the officer turn the detainment into an arrest.

94. Moreover, because the quantum of evidence to justify an investigatory stop

or arrest is based on the totality of the circumstances, the Fourth Amendment imposes an ongoing duty on officers to adjust their suspicion based on new facts.

95. As a result, the discovery of new information that undermines the initial basis for a seizure—such as someone stating that they're a citizen and providing their identification—requires the officer to terminate an investigatory stop or arrest.

96. The Fourth Amendment imposes an affirmative duty on officers who seize individuals to actively work to dispel any reasonable suspicion they might have had when they initiated the stop.

97. When federal officials are acting unconstitutionally or without lawful authority, courts may issue declaratory relief and enjoin the officers responsible from continuing to enforce those unlawful policies and practices.[31]

98. The Plaintiff has suffered and will continue to suffer a violation of their Fourth Amendment rights as a direct and proximate result of the official-capacity Defendants' enforcement of the challenged policies.

## SECOND CAUSE OF ACTION

Policies Contrary to the Fourth Amendment – APA

99. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 98 hereof, and incorporate the same herein by reference.

100. The Administrative Procedure Act provides a cause of action against, and requires courts to vacate and set aside, agency actions that are contrary to a constitutional right. See 5 U.S.C. §§ 702, 706.

101. The Fourth Amendment to the United States Constitution protects "[t]he

---

[31] Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 687–88 (1949).

right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

102. Moreover, the Fourth Amendment codifies the constitutional preference requirement for warrants based on probable cause before government agents can enter private property, conduct a search, or seize a person or their property.

103. The Fourth Amendment prohibits officers from stopping people at random to determine their immigration status.

104. To restrict an employee's movement to investigate their immigration status, officers must have specific articulable facts that, considered with the totality of the circumstances, reasonably warrant suspicion that a specific employee is in the country illegally.

105. Someone's race or ethnicity does not create reasonable suspicion of someone's immigration status.

106. An individual must do something to create reasonable suspicion.

107. Reasonable suspicion, in turn, allows only a limited detainment to gather information.

108. During that detainment, the officer may ask questions to confirm their suspicions, but the worker does not have to respond.

109. Only if the investigatory detainment reveals specific information to generate probable cause can the officer turn the detainment into an arrest.

110. Moreover, because the quantum of evidence to justify an investigatory stop or arrest is based on the totality of the circumstances, the Fourth Amendment imposes an ongoing duty on officers to adjust their suspicion based on new facts.

111. As a result, the discovery of new information that undermines the initial basis for a seizure—such as someone stating that they're a citizen and providing their identification—requires the officer to terminate an investigatory stop or arrest.

112. The Fourth Amendment imposes an affirmative duty on officers who seize individuals to actively work to dispel any reasonable suspicion they might have had when they initiated the stop.

113. When federal officials are acting unconstitutionally or without lawful authority, courts may issue declaratory relief and enjoin the officers responsible from continuing to enforce those unlawful policies and practices.[32]

114. Because the challenged policies violate the Fourth Amendment, this Court must vacate and set them aside. See 5 U.S.C. § 706.

### THIRD CAUSE OF ACTION
Policies in Excess of Statutory Authorization – APA
On behalf of Mr. Ruvalcaba Against the Defendant Agencies & the United States of America

115. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 114 hereof, and incorporate the same herein by reference.

116. The Administrative Procedure Act requires courts to vacate and set aside policies that exceed the administration's statutory authority. 5 U.S.C. § 706(2)(C).

117. By law, Congress gave immigration officers limited authority.

118. Immigration officers can question people they suspect to be in the country without documentation. 8 U.S.C. § 1357(a)(1).

119. And immigration officers can search the person and effects of someone seeking admission into the country. 8 U.S.C. § 1357(c).

---

[32] Larson v. Domestic & Foreign Com. Corp., 337 U.S. 682, 687–88 (1949).

120. But they cannot, without a warrant, search the person or effects of someone they merely suspect to be in the country without documentation.

121. The law also limits immigration officers' authority to make warrantless arrests for violations of immigration laws. An immigration officer must have probable cause to believe both that someone is in the country unlawfully and that they are likely to escape before the officer can obtain an arrest warrant. 8 U.S.C. § 1357(a)(2).

122. The preemptive-detention and continued-detention policies exceed these limits on immigration officers' authority.

123. The policies allow officers to detain people without a warrant until the person proves their legal presence.

124. Because the policies authorize the detainment to continue beyond a brief inquiry, it authorizes arrests.

125. The preemptive-detention policy permits immigration officers to effect arrests without probable cause to believe someone is in the country unlawfully and without any probable cause determination that they are a flight risk.

126. Yet the challenged policies authorize immigration officers to seize and detain people like Mr. Ruvalcaba without any prior investigation or particularized suspicion—let alone probable cause.

127. The challenged policies also authorize immigration officers to use preemptive and continued detentions to compel a search of people's persons and effects, without probable cause, in order to check a detainee's legal status.

138. Because these aspects of the policies exceed the statutory grant of authority, this Court must set them aside. See 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION
Arbitrary, Capricious, & Without Observance of Lawful Procedure – APA
On behalf of Mr. Ruvalcaba Against the Defendant Agencies & the United States of America

139. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 138 hereof, and incorporate the same herein by reference.

140. Federal agencies may not violate their own rules and regulations to the prejudice of others. That includes rules that limit an officer or employee's discretionary authority. 5 U.S.C. § 706(2)(A), (D); see also United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954).

141. An agency's failure to follow its rules and regulations is subject to review under Section 706 of the APA.

142. Binding regulations forbid immigration officers from briefly detaining any person for questioning about whether the person is or is attempting to be engaged in an offense against the U.S. or is an illegal immigrant, unless officers first have reasonable suspicion. 8 C.F.R. § 287.8(b)(2).

143. Binding regulations forbid immigration officers from arresting any person suspected of a crime against the U.S. or of being an illegal immigrant without first having probable cause that the person has committed said offense and is likely to escape before a warrant can be obtained. 8 C.F.R. § 287.8(c)(2)(i)–(ii).

144. Binding regulations require immigration officers to identify themselves as immigration officers as quickly as practicable. 8 C.F.R. § 287.8(c)(2)(iii)(A).

145. But under the challenged policies, officers do not have to identify themselves at all. Immigration officers conceal their agency insignia and often do not identify themselves as federal law-enforcement officers—let alone immigration officers.

29

146. Binding regulations require immigration officers to provide the basis for an arrest as soon as practicable. 8 C.F.R. § 287.8(c)(2)(iii)(B).

147. Because binding regulations limit whatever discretion immigration officers may have otherwise, this Court must set aside the policies that violate those regulations. See 5 U.S.C. § 706(2)(A), (D).

### FIFTH CAUSE OF ACTION
Fourth Amendment – Damages Action
Against Two Unknown Immigration Enforcement Agents (Officers Doe 1 and Doe 2 in their individual capacities Under the United States Constitution, as recognized in Bivens & the Westfall Act

Under the United States Constitution, as recognized in Bivens & the Westfall Act

148. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 147 hereof, and incorporate the same herein by reference.

149. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

150. Moreover, the Fourth Amendment codifies the constitutional preference for warrants based on probable cause before government agents enter private property, conduct a search, or seize a person or their property.

151.  Officers Doe 1 and Doe 2 violated Mr. Ruvalcaba's Fourth Amendment rights when they detained and arrested him without a warrant or probable cause and continued to detain him even after he provided his Green Card.

152. The officers lacked even reasonable suspicion to detain the Plaintiff when they preemptively detained the Plaintiff without any particular suspicion and without even asking any questions.

153. Whatever general suspicion existed based on the Plaintiff's demographic profile was dispelled by the fact that there was no particularized suspicion to believe that he was violating immigration laws.

154. Yet the officers held the Plaintiff down and reached into his pocket searching for his ID, which they then read and which should have caused them to recognize that the detention was unlawful.

155. Whatever suspicion the officers had before they checked the Plaintiff's Green Card fell well below the threshold for a seizure once the officers saw his Green Card.

156. Given the totality of the circumstances, the search and seizure of the Plaintiff were constitutionally unreasonable.

157. The Plaintiff has suffered violations of his clearly established Fourth Amendment rights as a direct and proximate result of Officers Doe 1, Doe 2, and Doe 3's conduct.

158. Because Officers Doe 1, Doe 2, and Doe 3 violated Mr. Ruvalcaba's Fourth Amendment rights, he can state a claim for damages against them. The Supreme Court in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), recognized a right of action for damages for Fourth Amendment violations. Congress preserved a right of action for damages for constitutional violations via the Westfall Act of 1988, 28 U.S.C. § 2679(b)(2)(A).

## SIXTH CAUSE OF ACTION
(Injunction and Damages for Violation of Section 504 of the Rehabilitation Act)

159.   The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 158 hereof, and incorporate the same herein by reference.

160. "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." (29 U.S. Code § 794(d).

161. "The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510,[1] of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment." (29 U.S. Code § 794(d).

162. The Defendants are subject to the requirements of section 504 because they receive federal funds to support services or programs.

163. The Plaintiffs are qualified individuals with a disability as defined by Section 504 of the Rehabilitation Act and is subjected to discrimination because they are individuals with a disability. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102). The Plaintiff is qualified to participate in Defendant's aids, benefits, and/or services within the meaning of Section 504.

164. Section 504 of the Rehabilitation Act may apply in this matter since it is unknown if the Responding Party received COVID-19 grants or has received other sources of funding from the federal government to keep their institutional operations going.

165. Defendant discriminated against the Plaintiff on the basis of his disability since he is an individual who is Deaf.

166. The Defendants discriminated against the Plaintiff because he is a person who is Deaf due to their refusal, failure, and/or neglect of the Plaintiff's disability and physically harming him as he attempted to indicate that he was Deaf. They handcuffed him and made it difficult for him to communicate in ASL and show that he had a green card. As a result, they engaged in illegal administrative procedures towards the Plaintiff.

167. Federal funding recipients with fifteen or more employees, including ICE "*shall provide* appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 34 CFR 104.52(d)(1).

168. The "shall provide" language makes clear that a qualified individual with a disability is not required to provide her own auxiliary aid, such as an interpreter; it is the federal funding recipient's obligation.

169. The Defendant engaged in discriminatory policies, practices, and procedures against the Plaintiff  because he is a person who is Deaf due to their refusal, failure, and/or neglect of the Plaintiff's disability and physically harming him as he attempted to indicate that he was Deaf. They handcuffed him and made it difficult for him to communicate in ASL and show that he had a green card.

170. The Defendant engaged in discriminatory administrative methods against the Plaintiff because he is a person who is Deaf due to their refusal, failure, and/or neglect of the Plaintiff's disability and physically harming him as he attempted to indicate that he was Deaf. They handcuffed him and made it difficult for him to

communicate in ASL and show that he had a green card.

171. The management, staff, administrators, as well as ICE officers working for ICE, in all instances, individually and/or acting as the Defendants' agents, discriminated against the Plaintiff They discriminated against him intentionally, recklessly and with malicious disregard for the Plaintiff's federally protected rights, because he is Deaf.

172. The injuries sustained by the Plaintiff relating to the Defendants' discrimination are ongoing until the discriminatory conditions are corrected by preliminary and permanent injunctions, enjoining the Defendants from further violations of Section 504.

173. The Plaintiff can show that there a sufficient likelihood that they will be affected by the allegedly unlawful conduct in the future given that he is only a Green Card holder and not a United States citizen and has a real and immediate likelihood of being confronted by ICE and physically assaulted by ICE because he cannot hear their commands or communicate with them in spoken English. He will likely experience a denial of benefits or discrimination as he currently holds a Green card.

174. Furthermore, the Plaintiff suffered actual financial loss by spending personal funds to travel to meet with medical professionals, taking a medical leave from work without pay and having to spend personal funds to meet with his attorney which he would not have otherwise had to spend had the Defendants acknowledged that he was deaf and not physically harmed him as he attempted to communicate with ICE officers and show his Green Card. He also experienced consequential damages, physical pain and suffering as well as lost opportunities damages, and nominal damages.

175. The Plaintiff is entitled to all remedies that are generally available in

disputes of contract.[33] Therefore, the Plaintiff is entitled to any other loss, including incidental or consequential loss, caused by the breach less the cost avoided.

176. The Plaintiffs have been forced to engage in the services of an attorney. Therefore, they are entitled to an award of the attorney's fees and costs. 29 U.S. Code § 794a.

## SEVENTH CAUSE OF ACTION
(Defendants Violated Plaintiff's Right To Procedural Due Process –
Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)

177. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 176 hereof, and incorporate the same herein by reference.

178. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

179. The Plaintiff is Deaf and his native and primary language is American Sign Language. The Defendant has a liberty interest in free speech via the 1st Amendment to communicate in American Sign Language. The ADA's requirement that public entities must "furnish appropriate auxiliary aids and services" to achieve effective communication such as providing an ASL interpreter provides statutory protection to the Plaintiff's right to free speech.

180. The Defendant interfered with his liberty interest by refusing, ignoring, or disregarding his communications with ICE indicating that he was deaf. They handcuffed him and made it difficult for him to communicate in ASL as he attempted to show that he had a green card. Instead, they physically harmed the Plaintiff as he attempted to

---

[33] (See *Cummings v. Premier Rehab Keller,* PLLC, 142 S. Ct. 1562 (2022), reh'g denied, 142 S. Ct. 2853 (2022)

indicate that he was Deaf.

181. Defendants have violated Plaintiffs' federal due process rights by refusing, failing, and/or neglecting his federal and statutory right to free speech in the form of communicating with ICE about the status of his disability and his legal status within the United States.

## NINTH CAUSE OF ACTION
(Defendants Violated Plaintiff's Right To Procedural Due Process --
Article I, Section 7 Utah Constitution)

182. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 181 hereof, and incorporate the same herein by reference.

183. Article I, Section 7 of the Utah Constitution states that "no person shall be deprived of life, liberty or property, without due process of law."

184. The Plaintiff is Deaf and his native and primary language is American Sign Language. The Defendant has a liberty interest in free speech via the 1st Amendment to communicate in American Sign Language. The ADA's requirement that public entitles must "furnish appropriate auxiliary aids and services" to achieve effective communication such as providing an ASL interpreter provides statutory protection to the Plaintiff's right to free speech.

185. The Defendant interfered with his liberty interest by refusing, ignoring, or disregarding his communications with ICE indicating that he was deaf. They handcuffed him and made it difficult for him to communicate in ASL as he attempted to show that he had a green card. Instead, they physically harmed the Plaintiff as he attempted to indicate that he was Deaf.

186. Defendants have violated Plaintiffs' federal due process rights by refusing,

failing, and/or neglecting his federal and statutory right to free speech in the form of communicating with ICE about the status of his disability and his legal status within the United States.

**TENTH CAUSE OF ACTION**
Assault
On Behalf of Arturo Ruvalcaba
Against Two Unknown Immigration Enforcement Agents (Officers Doe 1 & Doe 2) in their individual capacities under the Westfall Act, & Utah tort law[34]

187.    The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 186 hereof, and incorporate the same herein by reference.

188. In Utah, assault is the where the assailant attempts, with unlawful force or violence, to inflict bodily injury on an individual or commits an act, with unlawful force or violence, that causes bodily injury to an individual or creates a substantial risk of bodily injury to an individual.[35]

189. Here the unnamed ICE Officers acted intending to cause harmful or offensive contact with Mr. Ruvalcaba or put Mr. Ruvalcaba in fear of an immediate harmful or offensive contact and that the unnamed ICE agents were aware of their action and recognized the harmful or offensive contact was about to occur.

190. Contact is harmful or offensive if Mr. Ruvalcaba did not consent to the contact either directly or by implication. This includes all physical contact that Mr. Ruvalcaba expressly communicated was unwanted or that no reasonable person would

---

[34] Mr. Ruvalcaba plans to amend his complaint to bring this claim under the FTCA with the United States as a Defendant if his notice of claim is denied.

[35] See Utah Code 76-5-102. See also *Reynolds v. Macfarlane*, 2014 UT App 57, ¶ 7, 322 P.3d 755, *Tiede v. State*, 915 P.2d 500, 503 n.3 (Utah 1996), *D.D.Z. v. Molerway Freight Lines, Inc*., 880 P.2d 1, 3 (Utah Ct. App. 1994), overruled on other grounds in *Stephens v. Bonneville Travel, Inc*., 935 P.2d 518 (Utah 1997). Restatement (Second) of Torts § 21 (1965). *Tingey v. Midwest Off., Inc.*, No. 1:22-CV-00145-TC, 2023 WL 8602841, at *3 (D. Utah Dec. 12, 2023) (unpublished). *Billy v. Edge Homes*, No. 2:19-CV-00058-JNP-EJF, 2020 WL 2572522, at *5 (D. Utah May 21, 2020) (unpublished).

consent to.

191. On Monday, September 29, 2025, at approximately 4:20 p.m., Mr. Ruvalcaba was waiting at the SLCC bus stop on his way home from work when several individuals, later identified as ICE agents, arrived, and approached Mr. Ruvalcaba. Two ICE agents directly approached him. Both were dressed in green military-style uniforms with bulletproof vests and baseball caps, and their faces were partially covered. The agent positioned in front of him did not display any visible identification on their uniform, while the agent standing behind him had "ICE" labeled on their vest.

192. The agents began shouting commands, but since Mr. Ruvalcaba is Deaf, he was unable to understand what they were saying. He attempted to communicate his Deafness through gestures and by signing, but the agents continued to advance toward him. While Mr. Ruvalcaba was attempting to retrieve documentation to prove his lawful status in the United States, one agent stood behind Mr. Ruvalcaba and applied downward pressure on his shoulders while another agent positioned in front of him pulled forcefully on his arm. This action resulted in an injury to his elbow.

193. After returning home, Mr. Ruvalcaba experienced pain and swelling in his arm. When his wife arrived home, she observed the swelling and immediately contacted their doctor to determine whether he should go to the emergency room or wait until the following morning. After describing his condition, the doctor advised that he could wait to be seen the next day, as he was able to move his arm with pain and tolerate the application of ice.

194. On September 30, 2025, at 10:30 a.m., Mr. Ruvalcaba was examined by his primary care physician. She evaluated his range of motion and diagnosed him with a

sprained elbow. She provided a medical note excusing him from work for the remainder of the week and recommended beginning physical therapy.

195. On October 6, 2025, Mr. Ruvalcaba attempted to return to work but experienced significant pain and was unable to perform his duties. He contacted his wife around 9:00 a.m., and she picked him up from work. That afternoon, Mr. Ruvalcaba was re-evaluated by his physician, who noted that the swelling persisted. She again recommended physical therapy and issued an additional medical note excusing him from work for two weeks, from October 6 through October 17, 2025.

196. Following that appointment, Mr. Ruvalcaba's wife scheduled his first physical therapy session for October 9, 2025. During that session, the physical therapist provided exercises and stretches to support recovery and advised that he wear either a compression sleeve or a wrist brace for additional support. The therapist also instructed him to avoid repetitive movements and heavy lifting.

197. Mr. Ruvalcaba notified his employer that he intended to return to work on October 14, 2025, with medical restrictions. His employer requested a formal letter outlining these restrictions. His physician subsequently provided documentation stating that he was not to lift more than five pounds and should avoid repetitive movements involving his left arm.

198. Mr. Ruvalcaba had done nothing wrong. The immigration officers had no particularized suspicion to justify a detainment or probable cause to justify an attempted arrest.

199. And because the there was no legal justification for the assault, the resulting seizure was unreasonable and violated the Fourth Amendment.

200. Because Officers Doe 4 and Doe 5 were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Mr. Ruvalcaba has submitted claims under the FTCA to the agencies responsible for the torts committed on November 24, 2025. He includes this paragraph as a placeholder for his FTCA claim for the torts and will amend his complaint in six months if his notice of claim is denied.

201. Because Officers Doe 1 and Doe 2 were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); see Buchanan v. Barr, 71 F.4th at 1012–18 (Walker, J., concurring).

202. Because the tortious conduct of Officers Doe 1 and Doe 2 violated Mr. Ruvalcaba's constitutional rights, the Plaintiff can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

203. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in the Plaintiff's Fifth Cause of Action is also unavailable, then the Westfall Act is unconstitutional as applied to Mr. Ruvalcaba.

## ELEVENTH CAUSE OF ACTION
Battery
On Behalf of Arturo Ruvalcaba
Against Two Unknown Immigration Enforcement Agents (Officers Doe 1 & Doe

2) in their individual capacities under the Westfall Act, & Utah tort law[36]

204.    The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 203 hereof, and incorporate the same herein by reference.

205. Under Utah law, battery is where the assailant acted intending to make physical contact with the Plaintiff or another person; or put the Plaintiff in fear of an immediate physical contact; and contact with Plaintiff was the direct or indirect result; and the contact was harmful or offensive.

206. On Monday, September 29, 2025, at approximately 4:20 p.m., Mr. Ruvalcaba was waiting at the SLCC bus stop on his way home from work when several individuals, later identified as ICE agents, arrived, and approached Mr. Ruvalcaba. Two ICE agents directly approached him. Both were dressed in green military-style uniforms with bulletproof vests and baseball caps, and their faces were partially covered. The agent positioned in front of him did not display any visible identification on their uniform, while the agent standing behind him had "ICE" labeled on their vest.

207. The agents began shouting commands, but since Mr. Ruvalcaba is Deaf, he was unable to understand what they were saying. He attempted to communicate his Deafness through gestures and by signing, but the agents continued to advance toward him. While Mr. Ruvalcaba was attempting to retrieve documentation to prove his lawful status in the United States, one agent stood behind Mr. Ruvalcaba and applied downward pressure on his shoulders while another agent positioned in front of him pulled forcefully on his arm. This action resulted in an injury to his elbow.

208. After returning home, Mr. Ruvalcaba experienced pain and swelling in his

---

[36] Mr. Ruvalcaba plans to amend his complaint to bring this claim under the FTCA with the United States as a Defendant if his notice of claim is denied.

arm. When his wife arrived home, she observed the swelling and immediately contacted their doctor to determine whether he should go to the emergency room or wait until the following morning. After describing his condition, the doctor advised that he could wait to be seen the next day, as he was able to move his arm with pain and tolerate the application of ice.

209. On September 30, 2025, at 10:30 a.m., Mr. Ruvalcaba was examined by his primary care physician. She evaluated his range of motion and diagnosed him with a sprained elbow. She provided a medical note excusing him from work for the remainder of the week and recommended beginning physical therapy.

210. On October 6, 2025, Mr. Ruvalcaba attempted to return to work but experienced significant pain and was unable to perform his duties. He contacted his wife around 9:00 a.m., and she picked him up from work. That afternoon, Mr. Ruvalcaba was re-evaluated by his physician, who noted that the swelling persisted. She again recommended physical therapy and issued an additional medical note excusing him from work for two weeks, from October 6 through October 17, 2025.

211. Following that appointment, Mr. Ruvalcaba's wife scheduled his first physical therapy session for October 9, 2025. During that session, the physical therapist provided exercises and stretches to support recovery and advised that he wear either a compression sleeve or a wrist brace for additional support. The therapist also instructed him to avoid repetitive movements and heavy lifting.

212. Mr. Ruvalcaba notified his employer that he intended to return to work on October 14, 2025, with medical restrictions. His employer requested a formal letter outlining these restrictions. His physician subsequently provided documentation stating

that he was not to lift more than five pounds and should avoid repetitive movements involving his left arm.

213. Because Officers Doe 1 and Doe 2 were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); see Buchanan v. Barr, 71 F.4th at 1012–18 (Walker, J., concurring).

214. Because the tortious conduct of Officers Doe 1 and Doe 2 violated Mr. Ruvalcaba's constitutional rights, the Plaintiff can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

215. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in the Plaintiff's Fifth Cause of Action is also unavailable, then the Westfall Act is unconstitutional as applied to Mr. Ruvalcaba.

### FIFTEENTH CAUSE OF ACTION
False Imprisonment
On Behalf of Arturo Ruvalcaba
Against Two Unknown Immigration Enforcement Agents (Officers Doe 1 & Doe 2) in their individual capacities under the Westfall Act, & Utah tort law[37]

216. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 215 hereof, and incorporate the same herein by reference.

217. Under Utah Law, false imprisonment occurs when the ICE officers acted with intent to confine, restrain, or detain the Plaintiff and the Plaintiff was directly or indirectly confined, restrained, or detained unlawfully by ICE officers and that the

---

[37] Mr. Ruvalcaba plans to amend his complaint to bring this claim under the FTCA with the United States as a Defendant if his notice of claim is denied.

Plaintiff knew that he was confined, restrained, or detained without his consent or was harmed by the confinement, restraint, or detention.

218. Mr. Ruvalcaba was confined, restrained, or detained through physical force, verbal threats, or any other actions that would reasonably lead him to believe he was not free to leave.

219. On Monday, September 29, 2025, at approximately 4:20 p.m., Mr. Ruvalcaba was waiting at the SLCC bus stop on his way home from work when several individuals, later identified as ICE agents, arrived, and approached Mr. Ruvalcaba. Two ICE agents directly approached him. Both were dressed in green military-style uniforms with bulletproof vests and baseball caps, and their faces were partially covered. The agent positioned in front of him did not display any visible identification on their uniform, while the agent standing behind him had "ICE" labeled on their vest.

220. The agents began shouting commands, but since Mr. Ruvalcaba is Deaf, he was unable to understand what they were saying. He attempted to communicate his Deafness through gestures and by signing, but the agents continued to advance toward him. While Mr. Ruvalcaba was attempting to retrieve documentation to prove his lawful status in the United States, one agent stood behind Mr. Ruvalcaba and applied downward pressure on his shoulders while another agent positioned in front of him pulled forcefully on his arm. This action resulted in an injury to his elbow.

221. Officers Doe 1 and Doe 2 falsely imprisoned Mr. Ruvalcaba when they detained him without lawful authority on September 29, 2025.

222. Mr. Ruvalcaba was not free to move. He had to stay where the officers wanted him to stay and move where they wanted him to move.

223. The imprisonment was unlawful because the officers had no probable cause to believe Mr. Ruvalcaba violated the law.

224. Because there was no legal justification for the false imprisonment, the resulting seizure violated the Fourth Amendment.

225. Because Officers Doe 1 and Doe 2 were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); see *Buchanan v. Barr*, 71 F.4th at 1012–18 (Walker, J., concurring).

226. Because the tortious conduct of Officers Doe 1 and Doe 2 violated Mr. Ruvalcaba's constitutional rights, the Plaintiff can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

27. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in the Plaintiff's Fifth Cause of Action is also unavailable, then the Westfall Act is unconstitutional as applied to Mr. Ruvalcaba.

## RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court provide the following relief, inter alia, as permitted by law:

(a)    Declare that the search and seizure of Mr. Ruvalcaba on September 29, 2025, violated the Fourth Amendment and were tortious.

(b)    Declare that the challenged policies violate the Fourth Amendment.

(c)    Declare that the challenge policies exceed Defendant Agencies' statutory

jurisdiction, are arbitrary and capricious, and fail to observe procedures required by law.

(d)     Vacate and set aside the challenged policies under the Administrative Procedure Act.

(e)     Enjoin the challenged policies' enforcement against Arturo Ruvalcaba.

(f)     A declaration that Defendant(s)'s policies, procedures, and practices have subjected Plaintiff to discrimination in violation of Section 504 of the Rehabilitation Act;

(g)     A declaration that Defendant(s)'s policies, procedures, and practices have subjected Plaintiff to discrimination in violation of The Right To Procedural Due Process under the Fourteenth Amendment of the U.S. Constitution

(h)     A declaration that Defendant(s)'s policies, procedures, and practices have subjected Plaintiff to discrimination in violation of The Right To Procedural Due Process under the Fourteenth Amendment of Article I, Section 7 of the Utah Constitution.

(i)     Award nominal, compensatory, and punitive damages against the individual-capacity Defendants for their tortious and unconstitutional conduct.

(j)     Award nominal and compensatory damages against the United States for the tortious and unconstitutional conduct of its agents.

(k)     Award reasonable attorneys' fees, costs, and expenses.

(l)     Award any other legal or equitable relief that this Court deems proper.

## JURY DEMAND

Plaintiff through his undersigned attorneys, hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.


DATED this 28th day of November 2025

<u>/s/: Jared Allebest</u>

Jared Allebest,
#13485 (UT), 034640 (AZ), 325086 (CA)
Allebest Law Group
Attorney for Plaintiffs

## ATTORNEY CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2025, I have made service of the foregoing on the party/ies listed below via Hand Delivery and/or Electronically via USDC CM/ECF system.

KRISTI NOEM
Secretary of the U.S. Department of Homeland Security
United States Department of Homeland Security
245 Murray Lane, SW,
Washington, DC 20528

Todd Lyons
Acting Director of U.S. Immigration and Customs Enforcement
United States Immigration and Customs Enforcement
500 12th St., SW,
Washington, D.C. 20536

Pamela Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Robert Cordero
United States Immigration and Customs Enforcement
Assistant Field Office Director
Salt Lake City Field Office (ERO)
2975 Decker Lake Dr, Suite 100,
West Valley City, UT 84119

DATED this 28th day of November 2025
/s/ Jared Allebest
Allebest Law Group PLLC
Attorney for Plaintiff